DAVID SARRATT (SBN 332438)
EMMA CHESSEN (SBN 365130)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628
dsarratt@debevoise.com

Attorneys for Defendant
MICHAEL BRENT ROTHENBERG

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL BRENT ROTHENBERG,<br><br>Defendant. | Case No. 4:20-cr-00266-JST<br><br>**DEFENDANT'S MOTION FOR NEW TRIAL**<br><br>Date:  October 21, 2026<br>Time:  1:30 PM<br><br>**The Honorable Jon S. Tigar** |

**<u>NOTICE OF DEFENDANT'S MOTION FOR NEW TRIAL</u>**

PLEASE TAKE NOTICE that, on October 21, 2026 at 1:30 PM, or at a date and time thereafter to be set, before the Honorable Judge Jon S. Tigar, Defendant Michael Brent Rothenberg will move this court for an order granting defendant a new trial.

Dated: June 25, 2026                          Respectfully submitted,

                                             DEBEVOISE & PLIMPTON LLP


                                       By:    */s/ David Sarratt*

                                             DAVID SARRATT (SBN 332438)
                                             EMMA CHESSEN (SBN 365130)
                                             DEBEVOISE & PLIMPTON LLP
                                             650 California Street
                                             San Francisco, CA 94108
                                             Telephone: (415) 738-5700
                                             Facsimile: (415) 644-5628
                                             dsarratt@debevoise.com

                                             Attorneys for Defendant
                                             MICHAEL BRENT ROTHENBERG

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................5

II. BACKGROUND .....................................................................................................6

III. LEGAL STANDARD..............................................................................................8

IV. ARGUMENT ..........................................................................................................9

    A.    Trial Counsel's Failure to Consult a Forensic Accounting Expert Prior to Trial Was Objectively Unreasonable and Not the Product of Sound Strategy. ........................................................................................................9

    B.    Trial Counsel's Failure to Consult a Forensic Accounting Expert Prejudiced Mr. Rothenberg, Creating a Reasonable Probability of a Different Outcome at Trial. ...............................................................................................................13

        1.    Mr. Fujimoto Failed to Account for Permissible Purposes for Mr. Rothenberg's Challenged Expenses................................................................14

        2.    Mr. Fujimoto's Conclusions Regarding Mr. Rothenberg's Representations To Silicon Valley Bank Failed To Properly Consider Certain Key Terms Of The Relevant Fund Agreements. ...............16

        3.    Mr. Fujimoto's Cash-Tracing Conclusions May Be Misleading, And Flaws In His Approach Could Have A Meaningful Effect On Results. ..............................................................................................................17

        4.    Mr. Fujimoto Improperly Opines In His Expert Report On The Occurrence Of Fraud, Which Exceeds The Permissible Scope Of Expert Testimony For A Forensic Accounting Expert. ...............................19

V. CONCLUSION......................................................................................................20

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008) ................................................................ *passim*

*Dunn v. Neal*, 44 F.4th 696 (7th Cir. 2022) ................................................................ 13

*Harris By and Through Ramsyer v. Wood*, 64 F.3d 1432 (9th Cir. 1995)................................... 10

*Rogers v. Dzurenda*, 25 F.4th 1171 (9th Cir. 2022)........................................................ 10

*S.E.C. v. Cornerstone Acquisition and Mgmt. Co. LLC*, 2025 WL 276318 (S.D. Cal. Jan. 23, 2025) ................................................................ 19

*Strickland v. Washington*, 466 U.S. 668 (1984)................................................ 9, 10, 13, 20

*United States v. Brown,* 623 F.3d 104 (2d Cir. 2010)........................................................ 9

*United States v. Cronic*, 466 U.S. 648 (1984)................................................................ 9

*United States v. Pimentel*, 654 F.2d 538 (9th Cir. 1981) ................................................... 8

*United States v. Steele*, 733 F.3d 894 (9th Cir. 2013)...................................................... 9

*Weeden v. Johnson*, 854 F.3d 1063 (9th Cir. 2017)........................................................ 10

**Statutes**

18 U.S.C. § 1014................................................................ 6

18 U.S.C. §§ 1343 ................................................................ 7

18 U.S.C. § 1344................................................................ 6

18 U.S.C. §§ 1957................................................................ 7

**Other Authorities**

Fed. R. Crim. Pro. 33 ................................................................ 8, 9, 20

## I.    INTRODUCTION

Defendant Michael Rothenberg was convicted following a seven-week trial on counts of wire fraud, money laundering, and making false statements to a bank.  Mr. Rothenberg founded a venture capital firm, Rothenberg Ventures Management Company (RVMC) in 2012, through which he managed a series of venture funds.  Mr. Rothenberg also founded other related businesses in connection with his venture capital work, including River Studios, Folsom Property LLC (formerly known as Rothenberg Ventures LLC), River Ecosystem LLC (formerly known as Rothenberg Venture Events), and River Accelerator LLC.  Through these entities, Mr. Rothenberg coordinated a business accelerator which helped house, incubate and support many early-stage startups, which in turn received investments from Mr. Rothenberg's venture funds.

The government's theory of the case was that Mr. Rothenberg spent investor funds for inappropriate purposes, including on promotional events like a Founders Field Day and entertaining at various sporting events.  Trial Tr. vol. 3, 526-528.  The centerpiece of the government's proof at trial was the testimony of its forensic accounting expert, Gerald Fujimoto, a Deloitte partner and Certified Public Accountant (CPA) and Certified in Financial Forensics (CFF).  Mr. Fujimoto prepared a 169-page expert report analyzing inflows and outflows of money from Mr. Rothenberg's companies and funds; he testified at trial that Mr. Rothenberg misappropriated approximately $18.8 million from his investment funds, and that Mr. Rothenberg made false representations to Silicon Valley Bank in connection with obtaining a loan.

Mr. Rothenberg's appointed trial counsel, however, failed to consult a forensic accounting expert for any purpose in preparation for trial.  Trial counsel did not hire an expert to review and evaluate the opinions in Mr. Fujimoto's voluminous report—either to determine whether the defense could benefit from calling its own expert to rebut Mr. Fujimoto's methodology and conclusions or even simply to prepare for cross-examination of Mr. Fujimoto.  This was a fundamental error.  By failing to seek out and consult a forensic accounting expert in preparation for a trial in which years' worth of complex business transactions were directly at issue, trial counsel's performance on this critical issue fell below an objective standard of reasonableness.

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

Present counsel was appointed to assess whether trial counsel's failure to consult with or retain an expert at trial supported a claim of ineffective assistance of counsel. In order to make this determination, counsel engaged Greggory Peat, a Senior Managing Director at FTI Consulting, a leading national firm. Mr. Peat is a CPA and CFF, credentials that match Mr. Fujimoto's, and has been retained in previous matters for the government, including the U.S. Securities and Exchange Commission. After performing even a preliminary review of Mr. Fujimoto's expert report and trial testimony, Mr. Peat has identified several significant areas of professional disagreement with Mr. Fujimoto's analysis, all of which cast doubt on not only Mr. Fujimoto's work, but the government's entire theory of the case. These disagreements, had they been presented at trial through expert testimony and raised in cross examination, would have, at a minimum, been sufficient to undermine confidence in Mr. Fujimoto's methodology, analysis and conclusions, on which the government asked the jury to rely but were unrebutted by the defense.

At bottom, the case presented at trial was an accounting case, hinging on the tracing and interpretation of complex flows of money between investment funds, related business entities and banks. But only one side—the government—hired an accountant to perform this work and present their conclusions to the jury. This was not a strategic choice by counsel; without consulting an expert, counsel had no basis to make an informed decision on whether a competing expert could meaningfully rebut Mr. Fujimoto's conclusions. Mr. Peat's declaration accompanying this motion shows definitively that such an expert could indeed have presented credible, meaningful disputes that go to the crux of the case. Mr. Rothenberg respectfully moves for a new trial so that the government's expert evidence against him can be fairly tested and countered by a competing expert, allowing the jury to weigh both views.

## II.    BACKGROUND

Mr. Rothenberg was charged in a 23-count superseding indictment on August 20, 2020, with a variety of fraud offenses. Superseding Indictment, ECF No. 15. On October 25, 2021, this Court severed Count One, charging Mr. Rothenberg with bank fraud in violation of 18 U.S.C. § 1344, and Count Two, charging false statements to a bank in violation of 18 U.S.C. § 1014, from

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

the remainder of the charges in the superseding indictment for trial.  Order on Def.'s Mot. to Sever Counts 1-4, ECF No. 101.  Counts One and Two proceeded to trial in November 2022, resulting in a mistrial after jurors were deadlocked and could not reach a unanimous decision.  Minute Entry for Jury Trial, ECF No. 205.  Counts Three through Twenty-Three, alleging wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and money laundering in violation of 18 U.S.C. §§ 1957 and 2, proceeded to a seven-week jury trial held from October 3, 2023 to November 16, 2023.  The jury returned a guilty verdict on November 16, 2023.  Trial Tr. vol. 26, 4569:8-4574:13; Minute Entry for Jury Trial, ECF No. 337; Jury Verdict, ECF No. 339.

At trial, the government framed the "core of the case" as a story about how Mr. Rothenberg "overspent the money that his investors had entrusted him with by over $18 million." Trial Tr. vol. 3, 541:12, 526:14-529:17.  The government alleged that Mr. Rothenberg misled investors about how their investments in his venture funds would be used, and that Mr. Rothenberg made false statements to Silicon Valley Bank in connection with an application for a $4 million line of credit.  *See, e.g.* Trial Tr. vol. 3, 560:4-7, 544:14-545:4.  The government's theory of the case was that Mr. Rothenberg's spending, including on events such as Golden State Warriors finals tickets and an annual Founders Field Day at Oracle Park in San Francisco, created a cycle of debt that eventually led to alleged misuse of investor funds and an alleged misrepresentation for a loan application to cover his and his businesses' financial obligations. Because the ultimate issue at the heart of the government's case was how Mr. Rothenberg moved money and used funds, the government spent a significant amount of time at trial attempting to trace for the jury the complex cash flows between Mr. Rothenberg's funds, businesses, investment targets and bank accounts.  To do this, the government relied heavily on the expertise of Mr. Fujimoto, their forensic accounting expert whose testimony spanned two days, and whose cash-tracing analyses supplied the crucial grounding for the government's case in the voluminous financial record.

In addition to Mr. Fujimoto, the government called as witnesses former employees of RVMC and other Rothenberg business entities, investors into Mr. Rothenberg's funds, employees of several of Mr. Rothenberg's portfolio companies, law enforcement agents, and a former

employee of Silicon Valley Bank.  Jury Selection Tr. vol. 1, 23:3-25:12.  Several investor witnesses testified in support of the government's theory that Mr. Rothenberg had misrepresented how investor funds would be used.  These witnesses included Lena Goldberg, former Fidelity General Counsel who invested in Mr. Rothenberg's funds and who testified to being surprised that RVMC had invested in River Studios, as well as Amy Huang of ARCHina Capital Partners, another fund investor who testified that she understood her investment into Mr. Rothenberg's 2016 fund would be used for investments into frontier technology companies, and not used as collateral for a loan.  *See* Trial Tr. vol. 8, 1554:8-1555:8; Trial Tr. vol. 14, 2659:6-2660:5.

But ultimately, it was Mr. Fujimoto and his work that was the centerpiece of the government's case.  As the last witness called by the government before their closing, Mr. Fujimoto had the final word about the *actual transactions* the government alleged were fraudulent.  Mr. Fujimoto had this last word because he was the only witness with the forensic accounting expertise required to attempt to untangle and interpret the voluminous, complex fund accounting and financial records at issue in this case—meaning that all the preceding testimony from investors regarding Mr. Rothenberg's alleged misrepresentations about investments needed to funnel through Mr. Fujimoto — including his expert judgment on whether transactions were consistent with purposes authorized in the fund agreements — in order for the government to be able to prove that fraud had *actually* been committed.  The government had no way to answer the complex fund accounting questions at the heart of their fraud case without Mr. Fujimoto and his expertise.

But nor did the defense.  Trial counsel did not consult with a competing expert in preparing for trial, let alone present expert testimony challenging Mr. Fujimoto's conclusions.  Declaration of Michael Brent Rothenberg ¶ 2.

### III.    LEGAL STANDARD

A district court has the power to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. Pro. 33(a).  A motion for a new trial is "directed to the discretion of the judge."  *See United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).  Motions that are brought based on the ineffective assistance of counsel are within a district court's

jurisdiction to decide on the merits, including on a motion for a new trial. *See United States v. Cronic*, 466 U.S. 648, 667 n.42 (1984). The Ninth Circuit has confirmed that when a claim of ineffective assistance of counsel is brought before a district court for the first time before conviction, it is within the district court's discretion to consider the claim at that time. *United States v. Steele*, 733 F.3d 894, 897 (9th Cir. 2013) ("[T]he district court may, and at times should, consider the claim at that point in the proceeding." (quoting *United States v. Brown,* 623 F.3d 104, 113 (2d Cir. 2010))).

To evaluate claims of ineffective assistance of counsel, the Ninth Circuit applies the two-part cause and prejudice test set out in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a defendant to show that 1) counsel's performance fell below an objective standard of reasonableness, and 2) but for counsel's professional errors, there is a reasonable probability that the result of the trial would have been different. *See Duncan v. Ornoski*, 528 F.3d 1222, 1233-34 (9th Cir. 2008). Under the first requirement, a defendant must show that counsel's performance was "objectively unreasonable under prevailing professional norms and was not the product of sound strategy." *Id.* at 1234. Under the second, a defendant must show they were prejudiced by counsel's errors in a way that is "sufficient to undermine confidence in the outcome." *Id.* at 1239.

### IV.    ARGUMENT

Because trial counsel failed to consult with a forensic accounting expert prior to, or during, trial to evaluate and challenge Mr. Fujimoto's foundational contributions to the government's case, trial counsel's performance was objectively unreasonable under prevailing professional norms and was sufficiently prejudicial to Mr. Rothenberg's defense that his decision undermines confidence in the outcome of the trial. The Court should accordingly grant Mr. Rothenberg's motion for a new trial under Rule 33.

**A.    Trial Counsel's Failure to Consult a Forensic Accounting Expert Prior to Trial Was Objectively Unreasonable and Not the Product of Sound Strategy.**

Under *Strickland,* failing to conduct such "reasonable investigations" brings counsel's representation below an objective standard of reasonableness, satisfying the first prong of the test for ineffective assistance of counsel. *See Strickland,* 466 U.S. at 688, 691. The American Bar

Association's Criminal Justice Standards for the Defense Function emphasize a duty of defense counsel to "investigate in all cases." ABA Standards for Crim. Just.: Def. Function std. 4-4.1(a) (Am. Bar Ass'n 4th ed. 2017). Crucially, counsel's investigations "should also include evaluation of the prosecution's evidence (including possible re-testing or re-evaluation of physical, forensic, and *expert* evidence.)" *Id.* std.4-4.1(c) (emphasis added). Trial counsel's performance may be considered ineffective if counsel fails to anticipate, challenge or prepare for the prosecution's expert, including by failing to call their own. The Ninth Circuit has made the applicable rule here unmistakably clear: "[w]hen the prosecutor's expert witness testifies about pivotal evidence… defense counsel's failure to present expert testimony on that matter may constitute deficient performance." *Duncan,* 528 F.3d at 1235. When counsel fails even to consult an expert to evaluate the government's expert evidence, the deficiency is manifest. *See Rogers v. Dzurenda*, 25 F.4th 1171, 1183 (9th Cir. 2022) ("Trial counsel's decision not to consult or use [the expert] as a witness fell far below an objective standard of reasonableness."); *see also Harris By and Through Ramsyer v. Wood*, 64 F.3d 1432, 1435-36 (9th Cir. 1995) (holding that failure to obtain an expert for an independent evaluation of evidence is an "undisputed deficiency").

Trial counsel's failure to consult an expert here was not the product of sound strategy. As courts have made clear, to make a reasonable, strategic choice about how best to challenge crucial elements of the government's case, defense counsel must first perform a "reasonably substantial investigation" into available avenues of defense, including critical decisions such as whether to call an expert to testify, or whether to engage an expert to help prepare for cross examination of an opposing expert witness. *See Strickland,* 466 U.S. at 680, ("[R]easonably effective assistance must be based on professional decisions and *informed legal choices can be made only after investigation of options.*") (emphasis added). Courts have consistently held that counsel's investigation "must determine trial strategy, not the other way around." *See Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017).

Counsel simply cannot perform a "reasonable investigation" into their options for countering an opposing expert if they do not seek out the requisite expertise. Here, trial counsel failed to consult with *any* expert, let alone a forensic accountant with commensurate qualifications

or experience to that of Mr. Fujimoto.  Nor did counsel himself possess the same forensic accounting certifications or experience as Mr. Fujimoto at the time of trial.  It was thus unreasonable not to have, at minimum, sought the advice of a qualified forensic accounting professional to evaluate whether to hire an expert of his own, either to testify or to aid in preparing for cross-examination of Mr. Fujimoto.  *See Duncan,* 528 F.3d at 1235-1236 (discussing the importance of counsel seeking expert advice when counsel does not possess the necessary personal knowledge and qualifications).

The scale of the mismatch here is striking.  The underlying accounting and financial records in this case were so complex that Mr. Fujimoto testified at trial that he was paid approximately $385,000 for his work at an hourly rate of $420 an hour—meaning that Mr. Fujimoto spent over 900 hours preparing his report and expert testimony.[1]  *See* Trial Tr. vol. 20, 3856:14-22.  Mr. Fujimoto's 169-page expert report (including appendices) analyzes complex sequences of transactions, culled from voluminous records, involving multiple venture funds and businesses including Rothenberg Ventures Management Company, along with a variety of fund agreements, emails related to the ventures and Mr. Rothenberg, along with other documents.  *See* Expert Report of Gerald T. Fujimoto ¶¶ 7-19.

Nor was Mr. Fujimoto's report and testimony on some tertiary issue that counsel could have brushed aside as nonessential.  To the contrary, Mr. Fujimoto's report and testimony was central to the government's case against Mr. Rothenberg.  Mr. Fujimoto's testimony spanned two days of trial, covering approximately 232 transcript pages.  During the government's direct examination of Mr. Fujimoto, the government presented at least 165 demonstrative PowerPoint slides in aid of Mr. Fujimoto's testimony.  *See* Trial Tr. vol. 21, 4070:20.  The government invoked Mr. Fujimoto's work from the outset, asserting in opening that Mr. Rothenberg "overspent the money that his investors had entrusted him with by over $18 million."  Trial Tr. vol. 3, 526:14-16.  This figure would be entered into the trial record by Mr. Fujimoto's testimony

---

[1] Mr. Fujimoto's expert report notes a different rate of $775 per hour.  Expert Report of Gerald T. Fujimoto ¶ 437.  It is unclear, however, whether the above fees and rate to which Mr. Fujimoto testified included his work for the the U.S. Securities and Exchange Commission in the related civil matter.  Mr. Fujimoto's overall fees and hours of work across both matters may well have been substantially more than the trial testimony reflects.

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

days later, when Mr. Fujimoto testified that he calculated an unexplained difference in expected cash balances in Mr. Rothenberg's funds totaling $18,771,158.  Trial Tr. vol. 21, 3912:8.  The government's opening also suggested specific ways Rothenberg "spent too much money on everything," including sponsoring a racecar team, renting out the Fillmore concert venue, Golden State Warriors tickets and trips to Cabo San Lucas.  *See* Trial Tr. vol. 3, 526:21-22, 527:6-18.  The government refers to Mr. Rothenberg's spending as "a treadmill of debt" nine times.  *See id.* at 542:14-15.  Mr. Fujimoto used the same exact expenses that made up the government's "treadmill of debt" to trace through complex records, agreements, and accounts — work the jury itself was ill-equipped to do — and concluded that Mr. Rothenberg had misappropriated investor funds.  The case boiled down to the propriety of those expenses, and Mr. Fujimoto's testimony applied the imprimatur of professional expertise to resolve the complexity of a voluminous record into a simple conclusion, which went unchallenged.  But the amounts of those expenses, the total cost, and whether funds were misappropriated at all are all called into significant question by Mr. Peat's work in the attached declaration.

Likewise in summation, the government asked the jury, "how big was the lie?" only to answer, "Gerry Fujimoto told you."  Trial Tr. vol. 23, 4392:9-10.  Indeed, Mr. Fujimoto's analysis was the roadmap for much of the government's recitation of the evidence, laying out its theory of how money moved between business entities and funds, reiterating "you heard from Gerry Fujimoto."  *Id*. at 4411:5-8, 4424:15-17.  The government even *concluded* its closing arguments with Mr. Fujimoto's calculated "shortfall" of funds, asking the jury, "when everything is settled, what is the unexplained difference that Gerry Fujimoto told you?  $18 million unexplained difference.  I ask that you take all of the evidence that has been shown to you and you find the defendant guilty."  Trial Tr. vol. 23, 4447:21-4448:1.  The government only gets one chance at that last sentence — Mr. Fujimoto was its answer here.

In short, neither trial counsel nor the jury had the requisite expertise to untangle the relevant records in order to reach the fundamental question of the case — were Mr. Rothenberg's expenses improper?  Nor could the jury have been expected to devote 900 hours (roughly six months of full-time work) to the project on its own, as Mr. Fujimoto did.  Given the volume and

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

complexity of the financial records analyzed by Mr. Fujimoto and the required expertise to understand and distill them, as well as the centrality and importance of Mr. Fujimoto's analysis and testimony to the government's presentations to the jury, Mr. Rothenberg's trial counsel's failure to consult with a forensic accounting expert at the trial stage constituted objectively unreasonable and deficient performance, satisfying the first prong of the *Strickland* legal standard. *See Dunn v. Neal*, 44 F.4th 696, 708 (7th Cir. 2022) ("Because defense counsel… failed to investigate the defense as to the dispositive issue at trial… Dunn has demonstrated deficient performance").

### B. Trial Counsel's Failure to Consult a Forensic Accounting Expert Prejudiced Mr. Rothenberg, Creating a Reasonable Probability of a Different Outcome at Trial.

To demonstrate prejudice and satisfy the second prong of the *Strickland* test, a defendant must show that there is a reasonable probability, but for counsel's deficient performance, that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* In making this assessment, courts weigh the evidence that "could have been presented to the jury had counsel performed competently" against the evidence the jury heard at trial. *See Duncan*, 528 F.3d at 1240.

Here, as the attached declaration from Mr. Peat demonstrates, a forensic accounting expert would have been able to identify serious questions regarding Mr. Fujimoto's methodology, conclusions and credibility. Mr. Rothenberg's trial counsel's failure to consult with a forensic accounting expert thus significantly prejudiced Mr. Rothenberg. As noted above, there can be little dispute that Mr. Fujimoto's work formed an integral part of the government's case against Mr. Rothenberg. Undermining confidence in Mr. Fujimoto's conclusions about the use of money invested in Mr. Rothenberg's funds would therefore have had the effect of undermining confidence in the government's ability to prove beyond a reasonable doubt that Mr. Rothenberg committed wire fraud, bank fraud, and made false statements to a bank in connection with a loan application.

Mr. Peat's declaration sets out four principal conclusions, all of which meaningfully undermine Mr. Fujimoto's analysis.  Taken together, Mr. Peat's critiques are more than sufficient to undermine confidence in Mr. Fujimoto's opinions and the government's theory of the case.

1. **Mr. Fujimoto Failed to Account for Permissible Purposes for Mr. Rothenberg's Challenged Expenses.**

At trial, Mr. Fujimoto testified that the total "unexplained difference" in the cash balances of all of Mr. Rothenberg's funds was $18,771,158.  Trial Tr. vol. 21, 3912:8.  Mr. Peat's analysis, however, found that in calculating this shortfall, "Mr. Fujimoto failed to appropriately or completely account for outflows from the 2015 Fund and 2016 Fund related to the River Accelerator Program," and also "failed to account for permissible legal expenditures under the terms of the Fund Agreements associated with RVMC and/or Mr. Rothenberg's rights to seek indemnification from the Funds and to pursue legal actions on behalf of the Funds."  Declaration of Greggory Peat ¶ 26.  Additionally, Mr. Peat noted that further comprehensive accounting of the relevant financial records may identify "additional legitimate uses of cash that comprise the purported $18.8 million asset shortfall."  Peat Decl. ¶ 36.

Mr. Peat concluded, based on his review of Mr. Fujimoto's work and the funds' operating agreements that "between $4.2 million and $11.6 million (or more) of the $18.8 million 'asset shortfall' may have been used for legitimate business purposes."  Peat Decl. ¶ 36.  In reaching this conclusion, Mr. Peat notes that while Mr. Fujimoto accounted in his report for $8.3 million in "direct" investments the 2015 and 2016 funds made into portfolio companies, the agreements of both funds "explicitly stated that the Funds would allocate investments to the River Accelerator Program in the form of both direct cash investments into program participating companies as well as '*indirect investments*' in the form of cash outlays for various expenditures including, but not limited to, specialized equipment, real estate, events, and services provided by employees or contractors."  Peat Decl. ¶ 29. In other words, Mr. Fujimoto's "direct investment" calculation ignores precisely the kinds of business expenditures on networking and promotional events or real estate to benefit River Accelerator Program companies (for instance, providing the companies

office space, or buying tickets to Warriors games to allow founders and VCs to network) that the 2015 and 2016 funds' agreements explicitly authorized.

Mr. Peat further notes that, because RVMC was a startup with limited access to credit, Mr. Rothenberg "used his personal credit card and bank accounts to pay for indirect expenses related to the River Accelerator Program," and then sought reimbursement. Peat Decl. ¶ 31. Mr. Peat observes, however, that Mr. Fujimoto admits in his own report that, despite Mr. Rothenberg having "numerous American Express invoices that are often in the tens of thousands of dollars," Mr. Fujimoto failed to review Mr. Rothenberg's American Express statements or audit Mr. Rothenberg's "individual line items" when calculating the funds' alleged asset shortfall. *Id.* This glaring oversight in Mr. Fujimoto's analysis led Mr. Peat to conclude that "Mr. Fujimoto . . . did not identify, quantify, and contemplate potentially legitimate indirect expenditures related to the River Accelerator Program that were reflected in Mr. Rothenberg's personal accounts, despite the 2015 Fund and 2016 Fund Agreements stating that a meaningful amount of each Fund's proceeds would be used for such purpose." *Id.*

The same is true for legal expenditures. Mr. Peat identified provisions of the 2013, 2014, 2015, and 2016 funds' operating agreements that indemnified Mr. Rothenberg and RVMC for fund-related legal actions arising against them. Peat Decl. ¶ 34. In light of these provisions, and based on Mr. Fujimoto's own categorization of Mr. Rothenberg's use of funds, Mr. Peat identified "at least $3.1 million of legal expenditures that appear to fall within [all of the] Fund['s] Operating Agreements" which Mr. Fujimoto did not account for. *Id.*

These major disagreements with Mr. Fujimoto's analysis and calculation of his alleged asset shortfall, cast profound doubt on Mr. Fujimoto's conclusions—including, critically, doubt regarding whether there *was* a shortfall at all.

Importantly, Mr. Peat identified these serious disagreements with Mr. Fujimoto's analysis and conclusions regarding the alleged asset shortfall after only conducting an extremely time-limited review of both Mr. Fujimoto's work (which Mr. Fujimoto took over 900 hours to perform) as well as the funds' operating and related agreements. *See* Peat Decl. ¶ 17. If trial counsel had consulted with or retained a qualified forensic accounting expert to spend a comparable amount of

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

time to Mr. Fujimoto analyzing the underlying financial records, their testimony at trial or assistance in preparing cross examination would have been plainly sufficient to undermine confidence in Mr. Fujimoto's work and the government's case which relied on it.

       **2.**      **Mr. Fujimoto's Conclusions Regarding Mr. Rothenberg's Representations To Silicon Valley Bank Failed To Properly Consider Certain Key Terms Of The Relevant Fund Agreements.**

At trial, Mr. Fujimoto testified that Mr. Rothenberg had represented to Silicon Valley Bank when seeking a $4 million loan that the 2015 fund had raised $23.6 million and had eight years of prefunded management fees as of December 28, 2015, when in fact the fund only had raised approximately $13 million. *See* Trial Tr. vol. 21, 4018:4-7. Mr. Fujimoto additionally concluded in his expert report that outside investors had not prefunded eight years of management and administrative fees. Fujimoto Report, ¶¶ 130-32.

Although it went unchallenged by a competing expert at trial, this conclusion does not withstand scrutiny. As Mr. Peat observes, "Mr. Fujimoto's conclusion regarding whether the 2015 Fund had raised $23.6 million is incorrect and/or incomplete" because Mr. Fujimoto failed to account for (1) a provision of the fund's operating agreement which made management and administrative fees payable based on *both* capital contributions and unfunded capital commitments, and (2) "up to $10 million of additional investments in the 2015 Fund that . . . was expected from the 2016 Fund at the time Mr. Rothenberg's representation to SVB was made." Peat Decl. ¶¶ 38-39. This expected $10 million investment from the 2016 fund into the 2015 fund was explicitly provided for under the terms of the 2016 fund's operating agreement. *Id.* at ¶ 39. On the question of calculating management and administrative fees, Mr. Peat further noted that "Mr. Fujimoto determined that, after December 28, 2015, the 2015 Fund had raised an additional $1.1 million that may have represented unfunded Capital Commitments at that time." *Id.* at ¶ 38.

When these unfunded capital commitments and the $10 million investment from the 2016 fund are added to Mr. Fujimoto's accounting of $13 million in deposited funds, the total amount raised becomes approximately $24 million, "a figure notably consistent with the $23.6 million amount Mr. Rothenberg represented to SVB during the process of applying for the line of credit." *Id.* at ¶ 40.

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

### 3. Mr. Fujimoto's Cash-Tracing Conclusions May Be Misleading, And Flaws In His Approach Could Have A Meaningful Effect On Results.

Mr. Peat has also identified broad professional disagreement with Mr. Fujimoto's selected cash-tracing methodology, as well as Mr. Fujimoto's failure to present conclusions derived under equally acceptable alternative approaches. Because all of Mr. Fujimoto's conclusions flow from the cash tracing methodology he selected, Mr. Peat's methodological disagreements with Mr. Fujimoto's approach raise significant doubts about the full scope of Mr. Fujimoto's work supporting the government's case against Mr. Rothenberg.

Mr. Fujimoto testified that, in performing his analysis, he deployed a combination of FIFO and specific identification—an approach which allowed Mr. Fujimoto to supplement his FIFO analysis with professional judgments regarding the intent behind certain transactions. *See* Trial Tr. vol. 20 at 3871:4-3872:14. As Mr. Peat's declaration demonstrates, Mr. Fujimoto's exclusive use of FIFO mixed with specific identification was (1) misleading, (2) susceptible to bias and inconsistency, and (3) deprived the jury of the opportunity to understand how applying alternative, equally professionally defensible and sound cash-tracing methodologies would have materially changed the analysis of the underlying transactions. *See* Peat Decl. ¶¶ 48-52. The importance of individual professional judgment to Mr. Fujimoto's approach further highlights the necessity of having a competing expert to evaluate those judgments.

As Mr. Peat explains, Mr. Fujimoto's application of FIFO and specific identification to certain discrete investments is misleading because "determining whether the use of investor proceeds is appropriate should be performed at the Fund level," in recognition of the fact that venture funds deploy individual investors' capital only *after* that capital has entered a common pool. Peat Decl. ¶¶ 44-45. Therefore, "[i]n order to appropriately conclude on the use of investor funds, one would need to analyze the source(s) and use(s) of funds at the 'Fund' level, inclusive of all investments into the Funds." *Id.* at ¶ 46. Mr. Fujimoto at critical times failed to perform this "fund-level" analysis, instead analyzing certain transactions such as the Dolby Family Ventures LP investment into the 2016 fund as a discrete cash tracing exercise, rather than considering the "use of cash at the Fund level." *See id.* This is misleading because "Mr. Rothenberg was . . .

DEFENDANT'S MOTION FOR NEW TRIAL
CASE NO. 4:20-CR-00266-JST

responsible for utilizing investor funds, as a whole, in a manner that complies with the terms of the Fund Agreements,"—not for treating each investor's money as its own, distinct, unit of capital for allocation purposes. *See id.* at ¶ 45. This fundamental oversimplification by Mr. Fujimoto created a serious risk of misleading the jury that went unchallenged by a competing expert.

Additionally, Mr. Peat concludes that Mr. Fujimoto's hybrid application of FIFO and specific identification may lead to bias and inconsistency, identifying potential issues related to Mr. Fujimoto's use of judgment. Peat Decl. ¶ 48-49. After reviewing Mr. Fujimoto's work, Mr. Peat observes that "incorporating discretionary uses of judgment into a cash tracing analysis can expose Mr. Fujimoto's analysis to inconsistencies and instances of flawed decision-making that would be alleviated by strictly applying one (1) or more cash tracing methodologies." *Id.* at ¶ 49. This is a profound flaw in Mr. Fujimoto's methodology, since "[u]sing two (2) or more cash tracing methodologies provides the trier of fact with a menu of potential findings and the ability to assess which methodology is more suited to the specific issues at hand." Peat Decl. ¶ 51.

To illustrate this point, Mr. Peat applied FIFO as well as alternative, potentially better-suited and widely accepted tracing methodologies such as "Last In, First Out" ("LIFO"), "Proportionality," also known as "Pro Rata," and the "Lowest Intermediate Balance Rule" ("LIBR") to two sample investments into Mr. Rothenberg's 2015 and 2016 funds—investments which Mr. Fujimoto analyzed only using his combination of FIFO and specific identification. *See* Peat Decl. ¶ 54-58. Mr. Peat's analysis shows that applying these equally-accepted methodologies leads to dramatically different conclusions regarding the ultimate destinations of investors' funds.

Applying the proportionality method to Dolby's investment into the 2016 fund results in finding that $60,000 of the Dolby investment landed directly in the fund's portfolio companies, while Mr. Fujimoto concluded, using FIFO, that $0 did. Peat Decl. ¶¶ 54-55. This $60,000 figure, of course, is also not considering the closely-connected question of *indirect* expenditures related to the River Accelerator Program, which were authorized by the 2016 fund's operating agreement, as discussed above. Similarly, applying the LIFO method to GHF's investment into the 2015 fund results in finding an increase of $167,000 (or 34%) more than Mr. Fujimoto's calculated $488,694 going to direct investments into the fund's portfolio companies. *Id.* at ¶¶ 56-

57. This, too, is only a calculation of "direct" investments, and excludes potential investments into the River Accelerator Program that may have come from GHF's investment, as authorized by the 2016 fund's operating agreement.

These are only two examples of Mr. Fujimoto's pervasive methodological shortcomings that Mr. Peat was able to analyze given his limited time. Peat Decl. ¶ 44. But even given his constraints, the work Mr. Peat has been able to perform to date demonstrates that a competing expert retained at trial would have been able to significantly call into question vast portions of Mr. Fujimoto's work.

While trial counsel questioned Mr. Fujimoto about his use of the "First In, First Out" ("FIFO") cash tracing methodology on cross examination, such questioning naturally carried far less weight for the jury than a competing expert's testimony would have. Thus, depriving the jury of these materially-different conclusions based on equally-acceptable cash tracing methodologies to FIFO significantly prejudiced Mr. Rothenberg at trial.

> **4. Mr. Fujimoto Improperly Opines In His Expert Report On The Occurrence Of Fraud, Which Exceeds The Permissible Scope Of Expert Testimony For A Forensic Accounting Expert.**

According to the American Institute of Certified Public Accountants, providing opinions about the existence of fraud goes beyond the scope of professional competence for a CPA like Mr. Fujimoto. Rather, as Mr. Peat explains, CPAs are expressly prohibited from providing opinions that go beyond the scope of their professional competence when performing forensic services, including opining on the ultimate issue of fraud, a determination that is reserved for the trier of fact. Peat Decl. ¶ 22. Indeed, Mr. Fujimoto himself was recently subject to a successful *Daubert* motion precluding him from offering a similar opinion in another case. *See S.E.C. v. Cornerstone Acquisition and Mgmt. Co. LLC*, No. 22-CV-765 JLS, 2025 WL 276318, at *13 (S.D. Cal. Jan. 23, 2025) (granting defendant's *Daubert* motion to preclude Mr. Fujimoto from testifying as to "whether alleged misstatements were 'material' to investors"). Any CPA or forensic accounting expert that trial counsel could have consulted in this matter would have been able to identify this fundamental breach of professional standards and a potentially significant indicator of bias or results-oriented analysis. This knowledge would have allowed trial counsel to

19

make an informed, strategic choice regarding whether to raise the issue in cross examination. *See Duncan*, 528 F.3d at 1236 (holding that defense counsel who did not have personal expertise to make "strategic decisions" was "not qualified to undermine the State's case by simply cross-examining its experts without obtaining expert assistance himself."). Instead, trial counsel's failure to consult with such an expert and subsequent inability to make a judgment of how to approach the breach of professional standards when crafting Mr. Rothenberg's defense resulted in significant prejudice.

Because Mr. Peat's declaration clearly demonstrates that a forensic accounting expert at trial would likely have introduced to the jury serious, reasonable doubts regarding Mr. Fujimoto's methodology, analysis and conclusions—and with it the government's case against Mr. Rothenberg, which rested on Mr. Fujimoto's work—trial counsel's failure to consult a forensic accounting expert at trial gravely prejudiced Mr. Rothenberg. But for Mr. Rothenberg's trial counsel's failure to consult such an expert, there is a reasonable likelihood that the outcome of the trial would have been different, meeting the second prong of the *Strickland* standard. Therefore, the Court should grant Mr. Rothenberg's motion for a new trial under Rule 33 for ineffective assistance of counsel.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant Defendant a new trial.

Dated: June 25, 2026

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By:   */s/ David Sarratt*

DAVID SARRATT (SBN 332438)
EMMA CHESSEN (SBN 365130)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628
dsarratt@debevoise.com

Attorneys for Defendant
MICHAEL BRENT ROTHENBERG